Thank you, Your Honor. May it please the Court, Daniel Gertz for Mr. Dudley in this appeal. The principal issue on the appeal is sufficiency of the evidence, but I want to first touch on the sentencing arguments that have been, that remain after a previous panel of this Court a couple weeks ago issued the Rosebear decision. The Rosebear decided the question of how long a sentence could be imposed under the statute and whether imprisonment could be imposed. What it did not decide were three things. It did not decide the question of the propriety of imposing a term of supervised release. It did not address the legality of imposing a special assessment, or several in this case, four. It did not address the equal protection argument. Judge Fischer As I read your equal protection argument, it seemed to be very linked to the discretion that the district court had when using the Federal system rather than the State. So how does your equal protection claim survive? Mr. Dudley Well, the question that was addressed in Antelope, and that is the deciding case, I guess, it was, in that case it was the Federal Enclave Act, and whether a conviction for murder under Federal Enclave Act rendered that Native American at a disadvantage compared to if he were charged under the State law. What the Court found is that anybody on a Federal Enclave who commits murder and is charged with this crime is treated the same. And that can be, it doesn't matter race or ethnicity, they're all treated the same. Therefore, there's no equal protection argument. It specifically left open this case. It said, we are not concerned with instances in which Indians tried in Federal court are subjected to differing penalties and burdens of proof from those applicable to non-Indians charged with the same offense. And that is this case. It's charged under the Major Crimes Act, but only Native Americans can be charged under that act. So my client's neighbor committing the exact same offense, and this is a Minnesota offense that simply adopted for purposes of the Federal prosecution, that person convicted of the same offense is not subject to the same penalties that he would be in Federal court. And that's the distinction, and that's what remains open. With regard to supervised release, I found no case on point from this circuit that approved of his propriety. There was a case in this circuit regarding supervised release under the Assimilative Crimes Act. That's the Englehorn decision from 1997. That found it was appropriate. I'll let the Court decide if that reasoning extends to this. As for the special assessments, Congress specifically found that special assessments were to apply to assimilative crimes after courts found that there was not like punishment in State court under those prosecutions, and it could not be imposed. Congress expressly left open the question, or expressly left open, did not include the Major Crimes Act. So that argument is the same here, that it can't be imposed because there is no equivalent punishment under Minnesota law, and only punishments available under Minnesota law can be imposed. Now, the part that you're referring to, I think, is sub D of 3013, where it says, for purposes of this section, an offense under section 13 of the title is an offense against the United States. Is that the Assimilative Crimes Act point you're making? Yes, it is. Now, what if, independent of that text, what if the Court were to conclude that the offense in this case is an offense against the United States? Would that lead to the same conclusion on special assessment then? It would not lead to the same conclusion. Well, the problem is that that's a general provision under the Special Assessments 3013. It's in the general chapter. It's not in the chapter under the Sentencing Reforms Act that imposes all the sentencing things, including on, in crimes or conditions under the Assimilative Crimes Act and the Major Crimes Act. But I thought your point was that when Congress added subsection D here and said an offense under the Assimilative Crimes Act is an offense against the United States, that authorized the imposition of a special assessment in the Assimilative Crimes case. It specifically said that that section applied to conditions under the Assimilative Crimes Act. It did not say that it applies to convictions. Okay. I got that point. I got that point. But the reason it applies is because it's defined as an offense against the United States, as I understand it. That's why the assessment is available? That's why it's available in all cases except those cases where a statute specifically says it's not, and that's our case. 1153 says it's not because it's not available under Minnesota law. And that's why Congress had to amend it when it wanted to do, to have it applied to the Assimilative Crimes Act. It did not do so for the Major Crimes Act. It could amend the statute again. Thank you for your time.  So, yeah, let's . . . Thank you. We'll hear Mr. Schei now. Thank you. Tom Schei on behalf of Ms. Roy. I echo and agree with everything Mr. Girtz said. I think it applies equally. I don't necessarily need to wade back into that. I do want to touch on the sufficiency of the evidence arguments. I mean, it's replete and debrief. I know that's an uphill standard for this Court to apply. But I think one thing that this trial record established is not that either of these individuals intentionally or willfully deprived these children of what they needed, resulting in substantial harm. And it's particularly important with respect to minor child B. But in terms of what the record established, it established that they were incompetent as parents. That was the exact language of the state or the government's expert. They said they were unfit and incompetent. And in effect, what's happened from my perspective is that we've taken this statute and criminalized conduct that should have been treated in another form, namely with social services, child protection to the extent they existed at the Red Lake Reservation. And when you look at the record here, although they were involved, they were woefully inadequate. In the primary example, and I remember this vividly from trial, the primary investigator was trying to go out to contact them. He acknowledged that he didn't even go to the right house. He put the notice on the wrong door. Counsel, what about the unkept medical appointments when they drove by the facility to take them to the grandparent to stay and pick them up and take them back and forth, and they were driving by that facility? I don't think there was a medical appointment scheduled at that time, Your Honor. Well, they were told to make medical appointments, and they were not made. What the record showed is that they did that map, and they showed point A, point B, and said, look, driving right by, go get groceries, the same thing they said. All they want to do is make videos. Many times. Go ahead. But the situation is this. When they did have a medical appointment, they went. My client didn't drive. She went there, and although her conduct was not exemplary when she was at the hospital on occasion, she was like a mother bear, so to speak, but they did show up, and so did Mr. Dudley, and that's part of the problem. They did not have custody of these kids. This is not a rose bear situation where the lady was there full time even though by default. In this particular situation, at best, because of their very lack of skills, they only saw these kids maybe two days a week on an irregular basis. What was the evidence in the record on that? I was a little confused by the briefing on that. Excuse me. What was the custody situation, whether it was legal, whether it was informal? I would have to say it was a combination, but it was primarily informal. What happened is that there was a situation where Grandpa stepped in, and then by fiat or by approval of the tribe, so to speak, they authorized housing for him, for these children, and they ended up, but it wasn't like a formal hearing going into court and saying, here, now we have a change in the custodial arrangement based on this situation. The bottom line is they were not the primary caretakers, and maybe that's, I guess, a negative factor for them as parents, but like I said, and I'm not trying to be disparaging to my client or to Mr. Dudley, but we had a situation where they just didn't have the skills. Grandpa stepped in, and all these things that they said, well, you should have known that the other child, minor child B, had these deficiencies in school. They weren't involved in that, and maybe they should have been, but that's not the standard under the law. Our position is they didn't have the skills to do it, and more importantly, they did not intentionally or willfully deprive these children. I know there was substantial harm for child A. I'm not going to stand here. We conceded that in our brief, but the nexus, whether that was a result of my client's conduct, I maintain does not exist. What was the evidence on the limitations that you've described of your client as a parent that might suggest or indicate that this wasn't willful? I don't think there was any limitation, Your Honor, that precluded them from doing almost anything they wanted to do, except that I know there was a dispute between Mr. Dudley and his dad. Maybe limitation wasn't the right word. I meant sort of personal shortcomings that you said you described them as possibly incompetent, and I wondered what evidence might have been presented to the jury that would indicate that that was the reason for any concern for the children, rather than a willful conduct. There was testimony, as I recall, from the treating physician from the tribe, and they documented that the history of my client in terms of her upbringing was minimal, her desire to be treated by physicians, and in addition, there was nothing in there that actually said that they could not do something. I don't know if that's answering the question. I kind of lost my train of thought, I'll be honest. But I mean, there was nothing that precluded them from helping out, but they were, she had some chemical dependency problems, my client. She had an issue with marijuana. That was there. But whether that rose to the level of her deciding, look, I know I can do this, and I choose not to do this, and I'm going to willfully not do it, there was no testimony for that, Judge. That's all I have to say. I think we've covered it. But like I said, it was not willful, it was not intentional, and especially as it relates to minor child B, there was no substantial harm. Very well. Thank you for your argument. Ms. Kirkpatrick, we'll hear from you. Thank you, Your Honor. May it please the Court. I'd like to focus my time today, if I can, but I'm happy to answer any questions the Court has on sufficiency, because I do think the Rosebear decision issued two weeks ago does dispense with the other arguments that the defendants raised. The defendants' arguments in their briefs concerning sufficiency pertain to two shared elements in both the neglect and the endangerment statutes, and those are the elements of willfulness and causation. And essentially, the argument boils down to, we, the parents, Nicole Roy and Harrison Dudley, did what was asked of us when it was asked of us, so nothing else more was required of us, and so nothing that we did could have caused substantial harm, because we did what was asked when it was asked. And that argument fails for two reasons. First, the conduct alleged in this case was really a series of inaction. It was intentional failures to act, as much as it was intentional affirmative acts of conduct that led to substantial harm. So this case was an inaction case primarily. And second of all, this was a case that concerned a time span of approximately a year. So this is a pattern of conduct, a pattern of inaction, that led to the substantial harm in this case. So focusing on what one of the defendants did on any particular occasion isn't particularly helpful in the context of this case, where it's that pattern of conduct or that pattern of nonconduct that is essentially what caused the substantial harm in this case. You said substantial harm four or five times. Now, as to the child B, the boy, you had no expert testimony. What did the jury have to go on to find substantial harm to him? I'm aware he's in diapers. I'm aware of the mental challenges, et cetera. But what did you have on substantial harm as to him? That's part of it, Your Honor. At the very first doctor's appointment in February of 2022, Dr. Tatum, upon seeing minor B, was concerned for several reasons. One, that child had not been seen by a doctor despite the deficits since 2020. So two years had passed since these defendants brought these children to a doctor at all. And that's despite the fact that seven-year-old minor B was still in diapers, was nonverbal. And so Dr. Tatum at that point did two things as to minor B. She made a mandated report based on his condition, and she also referred him for therapeutic interventions for an evaluation to see if those interventions were necessary. That evaluation took place on April 11th of 2022. Harrison Dudley brought minor B to that appointment. He was evaluated, and the providers recommended therapeutic treatment to address these deficits. There was concern that he was developmentally delayed, as well as possibly suffering from mental retardation. Despite numerous attempts and appointments that were made, to obtain this therapy, Harrison Dudley, Nicole Roy, never followed through. They never sought any therapy for this boy. For now, two doctors have said treatment is necessary. And that lack of treatment is both medical neglect, as well as emotional neglect, which is also encompassed by the statute. A seven-year-old who's in diapers, who's not speaking, he needs therapy. That is his medical treatment. The second area of medical neglect in this case as to minor B is the lice. It was not as serious as minor A's lice infection. But there are notations beginning in that very first doctor's appointment in February 2022 that minor B had a serious lice infection. When he was brought to the doctor for a foot infection in December of 2022, the doctor in that instance noted minor B's serious lice infection. And what did Harrison Dudley do? He declined treatment. The doctor wanted his hair cut or shaved to get the lice off, but he declined it. He didn't get him treatment despite picking up the antibiotics at the pharmacy for the foot. He didn't do anything for the lice. And that lice continued to get worse and worse and worse till we find ourselves with minor B in January of 2023 at the Fargo Hospital for minor A's treatment, where the infectious doctor, just upon seeing minor B, not even his patient, he says, I have to treat this child. There is lice raining down off of his head. And there are scars, not scars, scabs and wounds on his scalp. Now, December 7th, the doctor characterized that lice infection as severe. It's a month later now, and the doctor is seeing lice fall off the child's head, seeing lice fall into his hoodie, seeing scabs on minor B's head. That was a severe infection. The doctor, the infectious disease doctor, prescribed shampoo. And what did Harrison Dudley do? He didn't pick up the prescription. The doctor had to follow through to prod him to pick up the infection. And even then, the jury could infer that Harrison Dudley didn't do anything with that because it was a week later that the parents brought minor B to the Indian Health Services to finally get treatment for that lice. So it was both the lack of seeking out therapeutic treatment, which qualifies as both a medical necessity, as well as an emotional need, as well as the lice that is the harm that was done, substantial harm that minor B suffered in this case. Now, I do want to touch on the white caps of all the inaction in this case. In February of 2022, that very first appointment, it was then that Dr. Tatum discovered that minor A was anemic, severely anemic, so much so that she had to go to the hospital and she had to get two blood infusions. And when she was discharged, Dr. Tatum gave explicit instruction and education about the need to have a well-balanced, iron-rich diet, the need to take the iron supplements, and the need to eliminate or substantially decrease the amount of milk that minor A was drinking because that inhibited her body's ability to absorb the iron. Explicit instructions and a prescription for iron supplements. They then, they being the defendants that are here on appeal, brought minor A home to the co-defendant grandfather's house. And Echo Roy, she's the teenage aunt who also lived in that household, testified that when they dropped minor A off, they gave no instruction to the family. They did not pass along any of this information that they had just received from Dr. Tatum following that hospitalization for a life-threatening anemia incident. That's intentional, that's willful inaction. They did not tell the custodial caretaker how to care for that child. They did not tell her that her medical needs required her to take the supplement as directed and to decrease her amount of milk intake. That's inaction. Then we have the inaction of the February 15th. They were told at discharge that a follow-up appointment was necessary. They didn't attend that appointment. Then there were a series of missed appointments. Then we get to April. That's the first time that minor A is seen by Dr. Tatum again following that February 2022 hospitalization. And at that time, Harrison Dudley admits minor A is not taking her iron supplement. A month later, he admits the same thing again to the doctor. Minor A is not taking the iron. Then in June, Nicole Roy takes minor A to the doctor. And this time she lies. She lies to Dr. Tatum and she says minor A is taking her iron supplements. She is eating an iron-rich diet and everything is fine. And this despite the fact that no one picked up an iron supplement refill at the pharmacy after April 11th. That was the very last time Harrison Dudley picked up iron supplements. But yet in June, Nicole Roy is saying that minor A is taking the supplement. That's a lie and it's an intentional lie. And it's an intentional lie that inhibited the doctor from treating minor A properly. So she lets minor A go home thinking everything's fine. The labs come back the next day and lo and behold, everything is not fine. It is not fine that her anemia is increasing or her hemoglobin levels are decreasing as well as the size of her red blood cells. That is inconsistent, according to Dr. Tatum, with someone who is either or taking the supplements or eating properly. You only need one of those. If she were doing either of those, her levels would not be dropping, but they were dropping. So numerous, numerous, numerous attempts to get this family in. And every time Harrison Dudley and Nicole Roy don't answer the phone, don't return a phone call to the clinics, to the social services, trying to reach them, trying to get them in front of the doctors again, that's intentional, willful failure to act. And they didn't have to, and the jury was entitled to fine, that they didn't do what they were asked, when they were asked, that their obligations were greater than that. They were the parents of these children and they knew that minor A and minor B were suffering. They knew that doctors wanted to see them and that they were supposed to come in for follow-ups, but they never picked up the phone and made a phone call themselves. They never stopped at the clinic, despite passing it numerous times a week, directly in between their house and the grandfather's house. Every time they did that, that was an intentional failure to act that ultimately resulted in the substantial harm to these children. I have a question on a different topic, unless you... On the Rosebear case, of course, the court held that Minnesota sentencing guidelines do not apply. How does that inform whether the special assessment is available? You said you thought Rosebear resolved that. I don't understand. I think, Your Honor, perhaps I don't understand how Rosebear and special assessments are, in fact, related to the Minnesota guidelines. The special assessment is a fee that's available under 3013, and the Minnesota guidelines are a custodial provision that provide for how long a defendant can serve. So, I spoke if I said that Rosebear decided the special assessment... What's your thought on special assessment then? My thought on special assessment is that 1313 controls, because this is an offense against the United States, and that is the beginning and end of the inquiry. It controls in the sense... That it requires an imposition of a special assessment against any person convicted of a crime or an offense against the United States. Well, is this an offense that is not defined and punished by federal law under 1153B? Or are you saying it's punished in part by federal law? I am saying that the Major Crimes Act, 1153, is the offense under which they were convicted, and that is a federal law which, as I cited in my 28J letter, the Tenth Circuit has held in a different context, is an offense against the United States. Now, I understood that point, that it's an offense against the United States, but then 1153B says, of course, if the offense is not defined and punished by federal law, then it shall be defined and punished in accordance with the laws of the state. And I thought we were operating here on the understanding that this offense is not defined and punished by federal law. And that's why we're looking to the laws of the state. But you seem to be saying it's punished in part by federal law because 3013 is a federal law that punishes in part by imposing a special assessment. So it seemed to me the argument is that it's punished by federal law partially and punished not by federal law with respect to, say, term of imprisonment. Is that a permissible reading of the statute, that it's a sort of a hybrid situation? Your Honor, I misspoke if I have given the impression that that is my argument here today. I don't think special assessments are a punishment. That's the first thing. And so they're not controlled by 1153B. Secondly... It's not punishment. What's the basis for saying it's not punishment? It's applied to every offense against the United States. It goes to the Crime Victims Fund. It's part of a criminal case. It's more administrative than it is punitive. All right. And what... Suppose we thought it was punishment, then where does that leave us? May I respond, Your Honor? Can 3013 still apply even if this is an 1153B case? It certainly can. And I think what's important to note is 1153B points parties, points defendants, the government, to state law only in cases where punishment isn't otherwise provided for. And as this Court held, the guidelines didn't even exist at the time that this statute was written. So 1153B is speaking to the custodial sentence, not more of the collateral consequence type situation that a special assessment is. And this Court has held repeatedly that special assessments are a collateral consequence. That's why the concurrent sentences doctrine doesn't apply in cases where a special assessment fee applies, because it's more collateral to the punishment than it is part of the conviction itself. Thank you, Your Honors. We ask that you affirm the judgment in the District Court. All right. Thank you for your argument. I think you used part of your rebuttal time, but we'll certainly allow you to use the remainder. I think, you know, I think Mr. Shia has rebuttal time too. I think he's going to cede it to me. I see. In any case, I know counsel was not present at the trial, but counsel was wrong about doctors trying to, calling these people and either of the disease defendants not answering. That did not happen. The hospital, the clinic, everybody in the tribal office considered Mr. Roy Grandpa to be the custodian of the children. That's the person who was the contact. The medical clinic contacted him, Dr. Tatum had a direct call with him, told him everything he needed to do to address this anemia, and it worked. There were months and months and months where minor A did just fine. There was no sense or any indication to these parents that she needed something else that she wasn't getting. Six months later into August, the pediatric specialist thought that the child was doing just fine. They were both there. That's what they heard from the doctor. No indication whatsoever that something was lacking. Why don't you go ahead and add Mr. Shia's time. Are you, in fact, ceding your time? I am, Your Honor. Very well. Then please add his time and we'll conclude with that. Thank you, Your Honor. Counsel did not answer your question about substantial harm to minor B because there was no evidence of it whatsoever. Her answer is, well, there should have been follow-up on the therapy appointments. There was, in fact, follow-up. It was one appointment. There weren't any other follow-ups, but there's no evidence at all that any harm came to the child by not going to a therapy appointment that may or may not have been useful. There was no evidence about whether it was really needed, and there was no harm at all proved as a consequence, zero. We also have the question of the endangerment. By permitting the children to live with Grandpa Roy, they, in fact, did the correct thing by permitting the children to live with Grandpa Roy because Grandpa Roy was the only person who was capable of providing the care, and he did a great job. It wasn't until January, almost a year later, that an issue occurred where the anemia came back and there was bad lice on minor A and she had to go to the hospital. Between February of 22 to January, there were no problems at all. There were at least six medical appointments, more than that if you count that entire period. The children or minor A was fine. Nobody had any concerns about minor B, and certainly didn't express any to these two parents. But as I pointed out, they did the correct thing by letting the children live with Grandpa because he was the one who actually provided decent care for them. There was a mention by counsel about this hospital visit where minor B's lice was bad. This was after all their parental rights had been removed, taken away when they had gone to the hospital in Fargo. They were told, you no longer have any custody. You don't have the rights. It's no longer, they no longer have the responsibility to provide any care or therapy at that point and simply can't. So to suggest that the harm that happened in the week after they were relieved of their responsibilities holds no weight. I appreciate your time. Thank you very much. Farewell. Thank you for your argument. Thank you to all counsel. The cases are submitted and the court will file a decision in due course. May I just say thank you to the clerk for dealing with us and trying to allocate the argument? You may indeed. You may indeed. We appreciate her good work on this session and that concludes the session for the day. The court will be in recess until...